**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| EVERAGE TUIRCUIT, III | CIVIL ACTION |
| VERSUS | NO. 13-6268 |
| WRIGHT NATIONAL FLOOD INSURANCE COMPANY, FORMERLY KNOWN AS FIDELITY NATIONAL INDEMNITY INSURANCE COMPANY | SECTION "L" (4) |

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

**I.      PROCEDURAL HISTORY**

This action arises out of a flood insurance claim made by Plaintiff Everage Tuircuit ("Mr. Tuircuit") against his flood insurer, Defendant Wright National Flood Insurance Company ("Wright"),[1] for damage his house sustained during Hurricane Isaac.

On October 28, 2013, Mr. Tuircuit brought a complaint alleging that Wright breached the insurance contract and failed to tender payment for losses covered under that contract. (Rec. Doc. 1). Specifically, Mr. Tuircuit sought reimbursement for those losses, court costs, and any other fair and equitable relief. *Id*. In its answer, Wright denies the allegations and asserts various affirmative defenses.  (Rec. Doc. 5). On August 25, 2014, the Court denied in part, and granted in part, Wright's motion for summary judgment. Although the Court found genuine issues of material fact, it also ruled that Mr. Tuircuit's Coverage A claim was limited to the actual cash value  ("ACV") of the dwelling. (Rec. Doc. 35). The Court also dismissed any extra-contractual claims.

This matter came for trial before the Court without a jury on September 15, 2014. After considering the testimony of the witnesses, the exhibits admitted into evidence, and the memoranda submitted by the parties, the Court now makes the following findings of fact and

---

[1] Wright was formerly known as Fidelity National Insurance Company. For the sake of clarity, the Court solely will refer to the Defendant as "Wright."

conclusions of law, pursuant to Federal Rule of Civil Procedure 52. To the extent that a finding

of fact constitutes a conclusion of law, the Court adopts it as such; to the extent that a conclusion

of law constitutes a finding of fact, the Court also adopts that as such.

## II.    FINDINGS OF FACT

This action arises out of damage caused by Hurricane Isaac. Everage Tuircuit held a

standard flood insurance policy ("SFIP") with Defendant Wright National Flood Insurance

Company, providing property coverage on a dwelling in LaPlace, Louisiana, up to $223,900 and

contents coverage up to $88,200, each subject to a $1,000 deductible. Mr. Tuircuit purchased the

house in 2008 and never lived at the property. Rather, his daughter, Courtney Tuircuit lived at

the dwelling with her fiancé, Brian Brown from 2008 until Hurricane Isaac swept through. Jared

Tuircuit, Mr. Tuircuit's son, previously lived at the dwelling for a period of time, but moved out

before Hurricane Isaac. Courtney, Brian, and Jared lived at the dwelling, with Mr. Tuircuit's

permission, rent-free and without a lease. Courtney Tuircuit paid the mortgage on the house.

On or about August 29, 2012, Hurricane Isaac caused flood damage to the insured house.

In early September 2012, Courtney called to notify Wright of the flood damage. On September 6,

2012, Wright sent an independent adjuster, Carl Neill of Fountain Group Adjusters, to inspect

the insured dwelling. During Mr. Neil's inspection, Courtney, Brian, and Mr. Tuircuit were

present, and Courtney explained to Mr. Neil that she and Brian lived in the house, which Mr.

Tuircuit owned. Shortly thereafter, Courtney hired a public adjuster, Michael Michio of

ProClaim, to assess the flood damage. Mr. Michio inspected the property and in October 2012

issued an estimate placing the replacement cost value of the dwelling at $132,759.05. Mr. Michio

based his estimate on local pricing of construction goods and services in New Orleans,

Louisiana. Mr. Michio also helped the Tuircuits prepare an inventory of personal property at the

insured dwelling that was damaged by the storm. That inventory set the personal property damage at a replacement cost value of $90,844.00.

After completing his estimate, Mr. Michio assisted the Tuircuits in drafting a proof of loss in the amount of $214,528.04. Mr. Tuircuit and Courtney signed the proof of loss, dated October 20, 2012. At some point between October 20, 2012 and November 16, 2012, Mr. Michio submitted that proof of loss to Wright. Mr. Michio also sent his estimate to Wright. Although Wright presented testimonial evidence that it never received the October 20, 2012 signed proof of loss, the Court finds that Mr. Michio's testimony is credible, and the Court concludes that the Tuircuits indeed timely submitted the October 20, 2012 proof of loss.

On January 4, 2013, Mr. Neil submitted his estimates: (1) building damage with a replacement cost value of $56,117.75 and an actual cash value of $51,604.63 and (2) contents damage with a replacement cost value of $38,475.84 and an actual cash value of $32,878.07. Based on Mr. Neil's estimates, Mr. Tuircuit signed a proof of loss dated January 3, 2013 for $83,482.70, along with a building replacement cost proof of loss for $4,081.04 in recoverable depreciation. Based on Mr. Neil's estimates, Wright paid Mr. Tuircuit $55,685.67 in building damages and $31,878.07 in contents damages for a total of $87,563.74.

To begin repairing the insured dwelling, Mr. Tuircuit, Courtney, and Brian spent several days gutting the dwelling's interior. Next, Courtney hired Santos Remediation to perform additional gutting, drying, and cleaning. The house was subjected to a "four foot gut," which means that the sheetrock is removed up to four feet. The parties agree that a four foot gut is the most cost effective way to gut a home, largely due to the standard four-foot size of drywall. Thereafter, Courtney took estimates from general contractors to continue repairs. After obtaining estimates from several companies from $90,000 to well over $100,000 in repair costs, Courtney

hired DDS Construction, which gave her an estimate of $65,386.50. DDS did not complete repairs, however, as the Tuircuits ran out of money.

The Tuircuits spent the following sources of money on repairing the house: $55,685.67 from Wright's building coverage payment, approximately $16,000 from Wright's contents payments, and between $5,000 and $7,000 of Courtney's personal money. Courtney testified that she used the repair process as an opportunity to remodel several features of the house. Based on Courtney's own testimonial admissions, and the convincing testimony of Wright's expert contractor John Crawford, the Court finds that some of the renovations constituted upgrades from the August 2012 condition of the home. Specifically, Courtney upgraded the formal living room (which now has a domed ceiling), the main bathroom (which now contains an upgraded tub and ceramic tiles instead of the previous, cheaper linoleum flooring), and parts of the kitchen (which now has a larger refrigerator and expanded granite countertops).

At trial, the parties presented largely conflicting expert testimony. The Court qualified Mr. Tuircuit's hurricane damage causation and cost estimate expert, Mr. Michio, and Wright's forensic / structural engineering and construction expert, John Crawford. Each expert testified regarding their own expert reports and the expert report of their opposing counterpart. Both experts agreed on several issues: (1) the hurricane caused damaged throughout the home, (2) the hurricane damaged tile floor throughout the home, the kitchen's granite countertops, and the front door, all of which required replacement, (3) Xactimate is industry-standard software proper for flood estimates using September/October 2012 local pricing in New Orleans, Louisiana, and (4) some of the repairs performed by DDS were substandard. Mr. Crawford's support for the items listed in (2), above, supplant Wright's initial estimate from Carl Neill that such items did not require replacement. Both estimates also include a 10% profit and 10% overhead for a

general contractor. The experts disagreed about whether specified items required replacement, and they also disagreed on general methodology for determining the loss.

Upon consideration of the evidence, the Court finds Mr. Crawford's expert opinion more persuasive than that of Mr. Michio. Notably, Mr. Crawford provided specific, compelling critiques of Mr. Michio's methodology, while Mr. Michio largely only provided general, unsubstantiated criticism of Mr. Crawford's analysis. Although Mr. Crawford's analysis is tempered by the fact that he visited the insured home for the first, and last, time on June 25, 2014, more than a year and half after the hurricane damage occurred, his assessment of the required repairs is nonetheless convincing. He explained various flaws and overestimates in the analysis of Mr. Michio. For example, Mr. Crawford explained that Mr. Michio's estimate provided for full wall replacement costs (including drywall installation, painting, and finishing) for parts of rooms which did not contain wall space – such as window breaks and entry ways. This flaw substantially undermines the value of Mr. Michio's estimate. Moreover, Mr. Crawford's credible testimony explained that Mr. Michio, in part: (1) estimated drywall expenses that were approximately double the actual cost, (2) seemingly manually overrode the Xactimate software improperly on various estimates, and (3) improperly contained an estimate for unnecessary and sometimes unperformed repairs. For example, Mr. Crawford explained that Mr. Michio improperly provided for re-wiring of the house's electrical system, although it was undamaged by the flood and apparently un-replaced. The Court is thus persuaded that Mr. Crawford's analysis in this case, with the modifications discussed herein, provides the proper benchmark for analysis of hurricane damages.[2]

---

[2] Although, generally, Mr. Crawford accurately estimated ACV, Mr. Michio's analysis is useful in providing a valid estimate for the modifications explained herein.

### A.      Coverage A – Building Damage

Mr. Crawford's analysis sets the ACV at $67,247.76. To ascertain the proper ACV, however, several modifications need to be made. First, $1,896.51 must be added for the removal and replacement of a forced air furnace because it is reasonable to replace the entire HVAC system, which was partially damaged.[3] Second, $964.26 must be added for content manipulation, as estimated by Mr. Michio, because contents must be removed before repairs can begin. Third, the Court will allow recovery for the bagging and proper removal of items waterlogged with category 3 water, for which the Court will add $4,000, a reasonable sum for such work.[4] Lastly, $4,081.84 must be deduced from any ACV award for improperly secured recoverable depreciation, which Mr. Tuircuit obtained even though he is ineligible to recover depreciation under an ACV formulation. These modifications, totaling an additional amount of $2,778.93, must be added to Mr. Crawford's estimate, for a total ACV of $70,026.69.

### B.      Coverage B – Personal Property Contents Damage

The personal property contents in the insured home either belong to Mr. Tuircuit or the residents of the home, Courtney and Brian. Mr. Tuircuit provided evidence of the personal property in the house: a contents list and various photographs. Although the Tuircuits claim almost $90,844 in personal property contents, this large amount has not been fully substantiated by receipts or other evidence. In contrast, Wright's independent adjuster, Mr. Neill, performed a detailed contents inventory and online price verification, which have been entered as exhibits. (Exhs. 19, 21). Based on this contents estimate, Wright paid out $31,878.07 in contents damages.

---

[3] This number, not part of Mr. Crawford's estimate, comes from Mr. Michio's estimate. In his testimony, Mr. Crawford acknowledged that HVAC systems often are integrated, which may require replacing the entire system if it is partially damaged. Mr. Crawford explained that he did not inspect the HVAC system closely enough to determine if it should be replaced in its entirely. The Court finds it reasonable to replace the entire HVAC system here.
[4] Mr. Michio persuasively explained that such bagged removal is necessary. The Tuircuits indeed bagged a number of items while gutting the house. The Court came to this number, first, by utilizing Mr. Michio's estimates for tearing out and bagging wet drywall, insulation, and carpet. However, that total, $6,251.73, is too high because the unbagged removal of many of these items is already provided for in Mr. Crawford's estimate. As such, the Court reduces this figure to $4,000, a more appropriate number for bagged removal.

A number of items in Mr. Neill's estimate were reduced in price or stricken for lack of flood

causation, lack of photographs, or lack of other evidence of loss. The Tuircuits dispute this

reduction and have included a list of "disputed contents," which they allege amount to $20,869.

Like the $90,844 claim, however, the Court finds this $20,869 to be unsubstantiated.  Many of

the items on the list of disputed contents are labeled with facially exorbitant values, including:

$500 for a t-shirt, $1,075 for a pair of Levi's Jeans,[5] $600 for a pair of underwear. Indeed, even

for those items supported by photographic evidence, the Tuircuits have not provided evidence of

the claimed price.

Having reviewed Mr. Neill's inventory and price verification, the Court finds that Mr.

Neill's personal property estimate is reasonable. In light of Mr. Neill's reasonable estimate and

the Tuircuits' unsubstantiated allegations, the Court further finds that the Tuircuits have not

demonstrated that Wright owes them additional Coverage B payments.

III.    CONCLUSIONS OF LAW

This Court has subject matter jurisdiction over this matter pursuant to 42 U.S.C. § 4072

as well as 28 U.S.C. § 1331, § 1332, and § 1337.  SFIPs are governed by statute, FEMA

regulations, and federal common law. *Wright v. Allstate Ins. Co.*, 415 F.3d 384, 390 (5th Cir.

2005). Any interpretation of those regulations by FEMA also governs, as long as that

interpretation is not inconsistent with the regulations or plainly erroneous. *Worthen v. Fid. Nat'l

Prop. & Cas. Ins. Co.*, 463 F. App'x 422, 426 (5th Cir. 2012) (citing *Stinson v. United States*,

508 U.S. 36, 45 (1993)). SFIPs must be "'strictly construed and enforced.'" *Id.* (quoting *Gowland

v. Aetna*, 143 F.3d 951, 954 (5th Cir.1998)). "In addition, the insured is charged with

constructive knowledge of the policy provisions and of the NFIP . . . 'regardless of actual

---

[5] The Court takes judicial notice that the most expensive pair of jeans on www.levi.com presently is $215. *See
Weaver v. United States*, 298 F.2d 496, 498 (5th Cir. 1962) ("Specific facts and propositions of generalized
knowledge which are capable of immediate and accurate determination by resort to easily accessible sources of
indisputable accuracy may be judicially noticed.").

knowledge of what is in the [r]egulations or of the hardship resulting from innocent ignorance.'"

*Id.* (quoting *Fed. Crop. Ins. Corp. v. Merrill*, 332 U.S. 380, 385 (1947) (alteration in original)).

Although federal law governs SFIPs, "general principles of state insurance law may be useful" in

interpreting them. *Id.* at 425.

> Under the SFIP, the insured must submit a proof of loss that meets certain requirements.

> 4.  Within 60 days after the loss, send us a proof of loss, which is your statement of the amount you are claiming under the policy signed and sworn to by you, and which furnishes us with the following information:
>     a.  The date and time of loss;
>     b.  A brief explanation of how the loss happened;
>     c.  Your interest (for example, "owner") and the interest, if any, of others in the damaged property;
>     d.  Details of any other insurance that may cover the loss;
>     e.  Changes in title or occupancy of the covered property during the term of the policy;
>     f.  Specifications of damaged buildings and detailed repair estimates;
>     g.  Names of mortgagees or anyone else having a lien, charge, or claim against the insured property;
>     h.  Details about who occupied any insured building at the time of loss and for what purpose; and
>     i.  The inventory of damaged personal property described in J.3. above.

44 C.F.R. pt. 61, app. A(1), art. VII(J). The SFIP further provides that the insureds "may not sue

[the insurer] to recover money under this policy unless [the insureds] have complied with all the

requirements of the policy." *Id.* art. VII(R).

> Generally, "an insured's failure to provide a complete, sworn proof of loss statement, as

required by the [SFIP], relieves the federal insurer's obligation to pay what otherwise might be a

valid claim." *Gowland*, 143 F.3d at 954. However, a proof of loss may be considered even if it

does not provide a "specific amount of damages" as long as it "provide[s] at least enough information for FEMA to evaluate the merits of the claim." *Copeland v. Fed. Emergency Mgmt. Agency*, No. 03–2704, 2004 WL 325577, at *1, *3 (E.D. La. Feb. 18, 2004) (Barbier, J). Additionally, the standard proof of loss form created by the Office of Management and the Budget – and which was used by the Tuircuits – provides that "[a]ny other information that may be required will be furnished and considered a part of this proof." (Rec. Doc. 15-5 at 2).

Here, the parties agree that Hurricane Isaac caused damage to the insured dwelling. Thus, the Court need only determine the scope of the damage reimbursable under the SFIP. As a threshold matter, the timely October 20, 2012 proof of loss, signed by Mr. Tuircuit and Courtney, suffices to establish notice to Wright under *Gowland*. 143 F.3d at 954; *see also Copeland*, 2004 WL 325577, at *1, *3. As explained in the Findings of Fact, the Court is satisfied that Wright received such notice. Accordingly, Mr. Tuircuit has sufficiently met the notice requirements of the policy and is not barred from his claim of additional payment under the SFIP.

A.      **Coverage A – Building Damage**

The Court has already determined that Mr. Tuircuit's building claim under Coverage A is restricted to ACV because he was not the principal resident of the insured dwelling at the time of loss. (Rec. Doc. 35). 44 C.F.R. pt. 61, app. A(1), art. VII(V)(4)(i). ACV means "the cost to replace an insured item of property at the time of loss, less the value of its physical depreciation." 44 C.F.R. pt. 61, app. A(1), art. II(B)(2). The Court may use an estimate to determine ACV, taking into consideration actual expenses incurred to ensure the validity of that estimate. *Stevens v. Allstate Ins. Co.*, 13-5102, 2014 WL 2882957, at *4 (E.D. La. 2014). For the reasons explained in the Findings of Fact, the proper ACV is $70,026.69. This amount includes overhead and profit. Both experts agree, and the Court finds, that it is proper here to include

9

overhead and profit within ACV. The facts of this case are unlike the situation assessed by the

Fifth Circuit in *Dwyer v. Fid. Nat. Prop. And Cas. Ins. Co.*, 428 F. App'x 270, 271 (5th Cir.

2011). There, the Fifth Circuit held that an award for overhead and profit, which intended to

reimburse for the expense of using an independent contractor, was inappropriate because the

insureds sold the home in its unrepaired state, thus never incurred the cost of a general

contractor. Here, however, the Tuircuits hired a general contractor to initiate repairs. These facts

indicate that the Tuircuits have incurred, or will incur, the expense of a general contractor.

Moreover, these facts show that a general contractor is reasonably required to complete the

repairs. *See Parr v. Allstate*, 13-6242, 2014 WL 5210902, at *4 (E.D. La. 2014) (Fallon, J.). For

these reasons, an award for overhead and profit is appropriate.

In determining the building award to Mr. Tuircuit, the Court must deduct the building

coverage payment he already received ($55,685.67) from the proper ACV ($70,026.69).

Therefore, the Court awards Mr. Tuircuit $14,341.02 due to Wright's underpayment of Coverage

A under the SFIP.

### B.     Coverage B – Personal Property Contents Damage

The SFIP only permits recovery for Coverage B personal property that is owned by (1)

the insured, (2) the household family members of the insured, or (3) guests or servants of the

insured. 44 C.F.R. pt. 61, app. A(1), art. VII(B)(1)(a). As explained in the Findings of Fact, all

personal property in the insured dwelling is owned by Mr. Tuircuit or the residents of the home.

Personal property coverage, then, depends on whether the residents of the dwelling – namely

Courtney and Brian – constitute Mr. Tuircuit's "guests" within the meaning of the SFIP.

No case law has analyzed what constitutes a guest under the SFIP. Accordingly, the

Court must turn to the SFIP's plain language. Black's Law Dictionary definitions of "guest"

include "A person who is entertained or to whom hospitality is extended  [or] . . . A nonpaying

passenger in a motor vehicle." BLACK'S LAW DICTIONARY (9th ed. 2009). In the latter scenario,

by comparison, various courts have categorized vehicle passengers as "guests" only when they

are guests "transported without pay." *See, e.g.*, *Coons v. Lawlor*, 804 F.2d 28, 32 (3rd Cir. 1986).

This guidance is instructive. Here, Courtney and Brian lived in the insured dwelling rent-free.

Mr. Tuircuit imposed no lease upon them. Courtney had actually intended to buy the house

herself, but only secured Mr. Tuircuit's signature on the mortgage documents due to Courtney's

financial difficulties. Courtney paid the mortgage. These circumstances indicate that the

residents of the insured dwelling are not tenants, but rather constitute "guests" within the

meaning of the SFIP. Therefore, as a matter of law, Coverage B allows for recovery of the

personal property at the insured dwelling. Thus, Wright's $31,878.07 payment for personal

property contents was legally proper. Even so, as explained in the Findings of Fact, the Tuircuits

have not demonstrated that Wright underpaid for personal property contents. Accordingly, the

Court awards no further contents payments.

## IV.    CONCLUSION

On the basis of the above findings of fact and conclusions of law, the Court finds that

Wright underpaid SFIP "Coverage A" Building Damages by $14,341.02. Accordingly, **IT IS

ORDERED** that Wright pay Mr. Tuircuit $14,341.02 in damages for underpayment.

New Orleans, Louisiana, this 4th day of November, 2014.

_____
UNITED STATES DISTRICT JUDGE